**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| BENEDORTSE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: |
| | ) | |
| v. | ) | Judge: |
| | ) | |
| AMAZON.COM SERVICES LLC and AMAZON.COM, INC., | ) | Magistrate Judge: |
| | ) | **JURY DEMAND** |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

### I. INTRODUCTION

1. Plaintiff BenedorTSE, LLC ("Benedor") brings this action for patent infringement against Defendants Amazon.com Services LLC and Amazon.com, Inc. (collectively, "Amazon"), arising from Amazon's unauthorized use of Benedor's patented technology for secure electronic transactions. Amazon's mobile shopping application, the Amazon Shopping app, in conjunction with Amazon's supporting account-authentication, device-registration and device-recognition, and stored-payment checkout and payment-authorization computer systems, infringed U.S. Patent Nos. 9,400,979 (the "'979 Patent") and 8,463,713 (the "'713 Patent") (collectively, the "Patents-in-Suit"), at least by practicing the patented methods for validating a user and the user's device and generating and transmitting encrypted user and device credentials to authorize transactions. Benedor seeks damages for past infringement, a declaratory judgment of infringement and validity, enhanced damages for willful infringement, and its attorneys' fees and costs.

### A. The Parties

2. Plaintiff BenedorTSE, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Franklin, TN.

3. Defendant Amazon.com Services LLC is a limited liability company organized and existing under the laws of the State of Delaware, formerly known as Amazon.com Services, Inc., and, on information and belief, a wholly owned subsidiary of Amazon.com, Inc. Amazon.com Services LLC identifies its own principal address as 410 Terry Avenue North, Seattle, Washington 98109-5210 in the captions of its own recent federal filings. See Complaint, Amazon.com Services LLC v. New York State Public Employment Relations Board, No. 1:25-cv-05311 (E.D.N.Y. Sept. 22, 2025), ECF No. 1. Its registered agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Amazon's own Conditions of Use state that "Amazon.com Services LLC and/or its affiliates ('Amazon') provide website features and other products and services when you visit or shop at Amazon.com, use Amazon products or services, [or] use Amazon applications for mobile." Conditions of Use, Amazon.com, https://www.amazon.com/gp/help/customer/display.html?nodeId=GLSBYFE9MGKKQXXM (last visited July 4, 2026). Amazon has likewise represented in federal-court venue briefing that "Amazon Services operates the Amazon retail website" and that "Amazon Services also owns and operates Amazon's nationwide network of fulfillment centers." Defendants' Opposed Motion to Dismiss for Improper Venue, TrackThings LLC v. Amazon.com, Inc., No. 6:23-cv-00133-ADA (W.D. Tex. Apr. 12, 2023), ECF No. 35 at 3. On information and belief, Amazon.com Services LLC is the operating entity for the Amazon.com online store and for the account-authentication, device-recognition, and stored-payment checkout and payment-authorization systems accused in this action.

4. Defendant Amazon.com, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices at 410 Terry Avenue North, Seattle, Washington 98109-5210, as stated on the cover page of its Form 10-K for fiscal year 2025, filed with the U.S. Securities and Exchange Commission on February 6, 2026. Amazon.com, Inc. is the ultimate parent of Amazon.com Services LLC and, together with its subsidiaries, conducts substantial and continuous business throughout the United States, including within this judicial district, by operating a major corporate and operations hub in Nashville, Tennessee and multiple staffed logistics facilities in this district, and by providing products and services, including the accused Amazon Shopping app and stored-payment checkout services, to residents of Tennessee. The Google Play store's "About the developer" legal disclosure for the Amazon Shopping app identifies "Amazon.com, Inc.," 410 Terry Ave N, Seattle, WA 98109-5210, as the developer entity responsible for that application. Amazon Shopping - Apps on Google Play, https://play.google.com/store/apps/details?id=com.amazon.mShop.android.shopping&hl=en_US (last visited Aug. 28, 2026).

**B. Jurisdiction and Venue**

5. This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7. This Court has personal jurisdiction over each Defendant because each has committed acts of patent infringement in this judicial district, has conducted and does conduct continuous and systematic business in this district, and has purposefully availed itself of the privileges of conducting business in the State of Tennessee, including by operating physical, staffed Amazon facilities in this district and by offering and providing the accused Amazon

Shopping app and stored-payment checkout services to residents of this district, who used those services in this district during the relevant damages period.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b) because each Defendant has committed acts of infringement in this district and has a regular and established place of business in this district. Amazon operates its publicly announced "Operations Center of Excellence," a multi-building corporate and operations hub at Nashville Yards in downtown Nashville, including offices at 101 Platform Way North and Amazon Tower II, 201 Platform Way North, Nashville, Tennessee 37203, located in Davidson County within the Nashville Division of the Middle District of Tennessee. The Industrial Development Board of the Metropolitan Government of Nashville and Davidson County approved the Economic Development Grant Agreement for that project — providing incentives for up to 5,000 Amazon jobs in downtown Nashville — with "Amazon.com Services, Inc.," the entity now known as Amazon.com Services LLC. Minutes, Industrial Development Board of the Metropolitan Government of Nashville and Davidson County (May 9, 2019), https://www.nashville.gov/sites/default/files/2021-12/IndDevBrd-Minutes-May-9-2019.pdf; see, e.g., Notice of Removal, Smith v. Amazon.com Services LLC, No. 6:21-cv-01074 (D. Kan. Mar. 22, 2021), ECF No. 1 (caption: "Amazon.com Services LLC f/k/a Amazon.com Services, Inc."). Amazon publicly committed to the Nashville hub under a long-term (approximately 20-year) lease and has publicly reported thousands of Amazon employees working at the site, and Amazon's own careers site lists "Amazon.com Services LLC" as the hiring entity for corporate positions at Amazon's Nashville, Tennessee offices. See, e.g., Amazon.jobs, Mechanical Integration Leader, OMHS (Job ID 10477929), https://www.amazon.jobs/en/jobs/10477929/mechanical-integration-leader-omhs (last visited Sept. 10, 2026) (listing "Amazon.com Services LLC" as the hiring entity). Amazon also operates

staffed logistics facilities within the Nashville Division, including the Amazon fulfillment center designated BNA3 at 2020 Joe B. Jackson Parkway, Murfreesboro, Tennessee 37127 (Rutherford County). Amazon.com Services LLC has established in this District, on its own sworn declaration, that it "operates a fulfillment center, known as BNA3, located in Murfreesboro, Tennessee." Harown v. Amazon, No. 3:20-cv-01029, Report and Recommendation (M.D. Tenn. Aug. 25, 2023) (undisputed fact, citing Amazon's Lott declaration), Memorandum (M.D. Tenn. Dec. 27, 2023) (identifying the defendant as "Amazon.com Services LLC"); see also Tennessee OSHA Inspection No. 1559059.015 (opened Oct. 20, 2021) (inspected establishment "Amazon.Com Services, Llc," 2020 Joe B. Jackson, Murfreesboro, TN). On information and belief, each of these facilities is a permanent, physical place of Amazon's business, is staffed by Amazon personnel, and is held out to the public by Amazon as an Amazon facility.

9. Amazon has committed acts of infringement in this district at least because customers in this district signed in to and completed purchases through the accused Amazon Shopping app in this district during the relevant damages period, and because Amazon provided, supported, and derived revenue from the accused services in this district.

## II. FACTUAL BACKGROUND

### A. State of the Art Prior to the Benedor Inventions

10. Prior to December 1, 2000, the growth of electronic commerce was hampered by the lack of convenient and secure payment systems. Most online transactions relied on "single-factor" authentication, typically a username and password, which was widely recognized as an insufficient security measure against theft and fraud.

11. Prior to December 1, 2000, a common method for securing data in transit was the Secure Sockets Layer (SSL) protocol. However, SSL only encrypted the communication channel between a customer and a merchant. Once the data arrived at the merchant's server, it was

commonly decrypted, exposing the customer's sensitive personal and financial information, such as full credit card numbers, to the merchant and leaving it vulnerable in the merchant's database.

12. Advanced but commercially unsuccessful protocols like Secure Electronic Transaction (SET) were developed to prevent merchants from seeing customer credit card numbers. SET required a complex infrastructure, including digital certificates for consumers, and was ultimately considered too cumbersome for widespread adoption, leaving a need for a more practical solution.

13. While multi-factor authentication (MFA) was a known security concept, its use in consumer e-commerce was not conventional or widespread. Existing MFA solutions were generally limited to niche, high-security enterprise or banking environments.

14. Using a customer's own computer or mobile device as an authentication factor by automatically reading a unique hardware identifier, such as a serial number, was not a routine or conventional practice. The concept faced significant privacy concerns and had not been implemented in any widely deployed system. Conventional systems did not treat the user's personal computing device itself as a security token.

15. In the then-prevailing e-commerce model, the customer's device did not typically encrypt user data or perform cryptographic security functions beyond the browser's handling of an SSL connection. The practice of having the client device itself combine multiple pieces of information and then mathematically scramble them into a single-use, secure code for that single transaction, thereby combining multiple authentication factors for verification by a trusted third party, was not a conventional or routine part of an online transaction.

16. As of December 1, 2000, a technological gap existed for a secure, practical, and convenient system for online transactions. No conventional or widely adopted technology existed

that could: (a) protect a customer's sensitive information from the merchant; (b) link a user's identity to their specific physical device in a secure and automated way; and (c) generate a unique, encrypted, single-use credential on the user's device to provide strong, "person-present" verification for the transaction.

### B. The Plaintiff and the Benedor Inventions

17. Richard F. Carrott was the founder of Benedor and is the sole named inventor on the Patents-in-Suit. In the early 2000s, Mr. Carrott sought to address the security risks inherent in online transactions.

18. Mr. Carrott conceived of and developed a novel system that avoided the transmission of sensitive personal information while still enabling robust, positive verification of both the user and their device. This patented system securely links a user's account to their specific device, generates secure encrypted identifiers, and facilitates network-based transaction authorization without exposing confidential data.

19. Mr. Carrott filed U.S. Application No. 09/726,304 on December 1, 2000 (the "Original Application"). The Patents-in-Suit claim priority to the Original Application, and the claimed inventions of the Patents-in-Suit are entitled to the priority date of the Original Application.

### C. The Patents-in-Suit

20. On July 26, 2016, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 9,400,979, entitled Transactional Security Over a Network. The '979 Patent is a member of the Carrott patent family that claims priority to the Original Application, and it issued from a continuation of the application that led to the '713 Patent. A true and correct copy of the '979 Patent is attached as Exhibit A.

21. On June 11, 2013, the USPTO duly and legally issued U.S. Patent No. 8,463,713, entitled Transactional Security Over a Network. The ’713 Patent is a member of the same Carrott patent family and likewise claims priority to the Original Application. A true and correct copy of the ’713 Patent is attached as Exhibit B.

22. The ’979 and ’713 Patents were issued after a full and fair examination by the USPTO. The Patents-in-Suit were valid and in full force and effect during the periods relevant to this action.

23. The Patents-in-Suit disclose novel systems and methods for conducting secure electronic transactions by using device and user identifiers to generate encrypted authorization requests.

24. The ’979 Patent claims a specific technical architecture, not an abstract idea. The specification explains that "[a]n important feature of the invention is that encoded customer information, such as credit card numbers (‘customer code’), is not available to merchants and, therefore, is not vulnerable to the merchant’s security or privacy entrustments. The customer code is stored on the customer’s storage device only, and it is in encrypted form." ’979 Patent col. 2 ll. 45-50. The specification also recites that the party receiving the transaction request "never gains access to the customer’s confidential information, such as credit card numbers"; it "only receives the encrypted customer code." Id. col. 18 ll. 60-66. The claimed methods change what data traverses the network in a payment transaction — the user’s device validates the user and validates itself, and an encrypted code created on the device from user-identifying and device-identifying information is transmitted in place of the customer’s payment credentials. As alleged above, that combination — treating the customer’s own device as an authentication token and substituting a device-generated encrypted credential for the customer’s sensitive information — was

unconventional as of December 1, 2000 and solved specific, recognized technological problems of network transaction security, including the exposure of card numbers in merchant databases and the absence of reliable user-and-device verification for card-not-present transactions. The '713 Patent, which shares the Carrott family specification, claims the same architecture with additional limitations, including that each encrypted user code is "valid only for a single request for an authorization decision."

25. Benedor is the owner of the entire right, title, and interest in the Patents-in-Suit, including the right to recover for past damages. Benedor has never authorized Amazon to practice any of its patents.

**D. Amazon's Infringing Activities and the Accused Instrumentality**

26. At all times relevant to damages in this case, Amazon has made, used, sold, and offered for sale in the United States its mobile shopping application, the Amazon Shopping app, which Amazon develops, distributes, and supports. Amazon publicly distributes the Amazon Shopping app through the Google Play Store as the Android application package com.amazon.mShop.android.shopping, and the Google Play listing reflects that the app has been available on Google Play since December 2014, well before the relevant damages period. Amazon Shopping - Apps on Google Play, https://play.google.com/store/apps/details?id=com.amazon.mShop.android.shopping&hl=en_US (last visited July 4, 2026). The app-store publishers of record for the Amazon Shopping app — Amazon Mobile LLC on Google Play and AMZN Mobile LLC on the Apple App Store — are, on information and belief, wholly owned Amazon subsidiaries acting at the direction and for the benefit of Defendants, and, as alleged above, Google Play's legal disclosure identifies Amazon.com, Inc. itself as the developer entity responsible for the app.

27. The Amazon Shopping app, together with Amazon's supporting account sign-in and authentication services, device-registration, device-recognition and device-management infrastructure, and stored-payment checkout and payment-authorization systems, are collectively referred to herein as the "Accused Instrumentality."

28. The Accused Instrumentality, operating on customers' mobile devices in conjunction with Amazon's supporting systems, practiced the inventions of the Patents-in-Suit during the periods relevant to damages in this case.

29. Amazon publicly describes, in its own customer-facing and developer-facing materials, and the Accused Instrumentality's observable operation confirms, that the Accused Instrumentality performed the following operations, which together practiced at least one claim of each of the Patents-in-Suit during the respective damages periods:

30. **Password sign-in through a graphical interface.** The Amazon Shopping app requires the user to sign in to his or her Amazon account by entering account credentials, including a password, through the app's graphical sign-in interface before the app will provide access to the customer's account and its stored payment methods, and the app gates certain sensitive account and payment actions behind additional re-authentication. The app, operating in conjunction with Amazon's account-authentication services, determines whether the entered password is valid and denies access if it is not. Throughout the damages period, Amazon's account-security documentation described device-sensitive, risk-based authentication surrounding that password sign-in: Amazon's Two-Step Verification "adds an extra layer of security by asking you to enter a unique security code in addition to your password on computers and devices that you haven't designated as trusted," Turning on Two-Step Verification, Amazon Help (Internet Archive capture dated Nov. 28, 2020),

https://web.archive.org/web/20201128034255/https://www.amazon.com/gp/help/customer/display.html?nodeId=202073820, and Amazon explained that an additional verification step "happens when your sign-in activity looks different because you've cleared your cookies, or you're signing in from a new browser, device, or location," About Multi-Factor Authentication, Amazon Help (Internet Archive capture dated Mar. 27, 2022), https://web.archive.org/web/20220327030407/https://www.amazon.com/gp/help/customer/display.html?nodeId=G9MX9LXNWXFKMJYU.

31. **Device registration, recognition, and management.** Amazon registers and recognizes the specific devices on which a customer signs in to and uses his or her Amazon account. Throughout the damages period, Amazon's help documentation described per-device registration and management of the devices associated with a customer's account: customers could view the devices registered to their accounts under the "Devices" tab of the Manage Your Content and Devices page and could deregister a device — including a mobile device running Amazon's app — so that it could no longer be used with the account. Manage Your Amazon Accounts on Mobile Devices, Amazon Help, https://www.amazon.com/gp/help/customer/display.html?nodeId=G5LD93RTW3MMDKCR (Internet Archive captures dated Sept. 9, 2020, https://web.archive.org/web/20200909220732/https://www.amazon.com/gp/help/customer/display.html?nodeId=G5LD93RTW3MMDKCR, and May 1, 2022, https://web.archive.org/web/20220501170357/https://www.amazon.com/gp/help/customer/display.html?nodeId=G5LD93RTW3MMDKCR); Deregister a Device, Amazon Help (Internet Archive captures dated Nov. 12, 2020 and Apr. 7, 2021),

https://web.archive.org/web/20201112021614/https://www.amazon.com/gp/help/customer/display.html?nodeId=201357520 ("You can deregister a device from your Amazon account if you no longer want to use it to purchase apps or in-app items.").

32. Amazon's own developer documentation from the damages period describes the device-registration architecture underlying Amazon's application ecosystem. Amazon Device Messaging issues a "registration ID" that "identifies a unique instance of your app, running on a specific device, registered to a specific user." Amazon Device Messaging Overview, Amazon Developer Documentation (Internet Archive captures dated June 6, 2020 and Dec. 6, 2020), https://web.archive.org/web/20200606145515/https://developer.amazon.com/docs/adm/overview.html. Amazon's Alexa Voice Service documentation likewise shows a device serial number bound into the Login with Amazon authorization that links a device to a customer's Amazon account. Authorize from a Companion App, Amazon Developer Documentation (Internet Archive capture dated Jan. 15, 2021), https://web.archive.org/web/20210115190548/https://developer.amazon.com/en-US/docs/alexa/alexa-voice-service/authorize-companion-app.html. And publicly available open-source implementations of Amazon's device-registration API document that registering an app instance with Amazon's api.amazon.com/auth/register endpoint submits a "device_serial" value and device type and returns device-bound credentials — including a device token (an "adp_token") and a device private key — that are thereafter used to compute a per-request cryptographic signature transmitted with requests to Amazon's application programming interfaces. See, e.g., Audible (open-source client library), src/audible/register.py and src/audible/auth.py, https://github.com/mkb79/Audible/blob/b5436fea39c10451a82464cedc9d0ed33d4a8fb1/src/audible/register.py;

https://github.com/mkb79/Audible/blob/b5436fea39c10451a82464cedc9d0ed33d4a8fb1/src/audible/auth.py (documenting the /auth/register registration flow and request signing as of the library's Apr. 11, 2022 revision, commit b5436fea). On information and belief, the Amazon Shopping app and Amazon's supporting account-authentication and device-recognition systems employed Amazon's device-registration architecture during the damages period: the app read a device-specific hardware identifier from the user's device, the device was registered to the customer's account, and Amazon's systems determined whether that identifier corresponded to a device recognized for the customer's account — the set of devices permitted on that account.

33. **Stored-payment checkout.** Amazon customers store payment methods, including credit and debit cards, with their Amazon accounts, and Amazon's help documentation describes how customers add, update, and manage those stored payment methods. How to Update Your Amazon Payment Method, Amazon Help, https://www.amazon.com/gp/help/customer/display.html?nodeId=GPVBVQ28CKHD7ZQW (last visited July 4, 2026). When a signed-in customer completes a purchase in the Amazon Shopping app using a stored payment method, the customer does not re-enter full card details; instead, on information and belief, the app transmits an encrypted, cryptographically authenticated transaction request carrying credentials derived from customer-identifying and device-identifying information — including credentials issued upon registration of the app instance and device to the customer's account, accompanied by a per-request cryptographic signature computed with a device-bound key — to Amazon's retail and payment-processing infrastructure, which submits the charge on the customer's stored payment method through the payment network to the card-issuing financial institution for an authorization decision.

34. **Authorization and order completion.** When the payment is authorized, Amazon's systems return a confirmation to the customer's device — for example, the order-confirmation screen displayed in the Amazon Shopping app — and Amazon performs the transaction by completing the sale and fulfilling the order.

35. Amazon derives substantial revenue and strategic benefit from the Accused Instrumentality. The sign-in, device-recognition, and stored-payment checkout features of the Amazon Shopping app reduce friction at the point of purchase, increase conversion and customer retention, and are technically necessary for customers to complete app purchases with stored payment credentials. On information and belief, tens of millions of users in the United States engaged with the accused features of the Accused Instrumentality during the relevant damages period, and hundreds of billions of dollars in United States retail e-commerce sales flowed through Amazon's own app and site checkout using stored payment credentials during that period. These benefits are directly attributable to the accused authentication and transaction-authorization features of the Accused Instrumentality.

36. Amazon's stored-payment checkout architecture is strategically central to its business, and during the damages period Amazon expressly marketed the security property at the heart of the Benedor invention — that the party on the other side of the transaction never receives the customer's payment credentials. Amazon told users of its Amazon Pay checkout service, which lets customers pay on third-party sites using the payment methods stored in their Amazon accounts: "We do not share your full credit card, debit card, or bank account number with sites or charitable organizations that accept Amazon Pay." Amazon Pay, https://pay.amazon.com/ (Internet Archive capture dated Oct. 1, 2020),

https://web.archive.org/web/20201001131604/https://pay.amazon.com/; accord Amazon Pay Frequently Asked Questions, Amazon Pay Help (Internet Archive capture dated May 22, 2021), https://web.archive.org/web/20210522020757/https://pay.amazon.com/help/201754640 ("We don't share your full credit card, debit card, or bank account number with merchants or charitable organizations who accept Amazon Pay."). In April 2022, Amazon announced Buy with Prime, extending Amazon-account stored-payment checkout to third-party merchants' own online stores, with "Prime members [using] the payment and shipping information stored in their Amazon account." Press Release, Amazon Unveils Buy with Prime (Apr. 21, 2022), https://press.aboutamazon.com/2022/4/amazon-unveils-buy-with-prime-expanding-prime-shopping-benefits-beyond-amazon-com.

### E. Amazon's Willful Infringement

37. On information and belief, Amazon has had knowledge of the Patents-in-Suit and of the Carrott patent family since before and during the relevant damages period. Amazon is a sophisticated technology company with one of the largest patent portfolios in the United States and routinely monitors patent issuances in the fields of network security, authentication, electronic payments, and electronic transactions. The '979 Patent is publicly available through the USPTO.

38. Amazon's knowledge of the Patents-in-Suit and the Carrott patent family is established by the face of Amazon's own patents and by Amazon's own submissions to the USPTO.

39. U.S. Patent No. 11,016,954, entitled "Distributed data set extraction for migration," issued May 25, 2021, and assigned to Amazon Technologies, Inc. — the Amazon subsidiary that, on information and belief, holds patents for the Amazon corporate family — cites U.S. Patent No. 9,400,979 (Carrott) on its face without an examiner-citation designation. On information and belief, because the '979 Patent appears on the face of the '954 Patent without an examiner-cited

designation, Amazon itself disclosed the ’979 Patent to the USPTO in an Information Disclosure Statement during that prosecution, demonstrating Amazon’s actual knowledge of the ’979 Patent and its disclosure no later than May 25, 2021 — during the relevant damages period and while the ’979 Patent was in full force and effect.

40. In addition, at least three earlier patents assigned to Amazon Technologies, Inc. — U.S. Patent No. 9,887,998, entitled “Security model for data transfer using a shippable storage device,” issued February 6, 2018; U.S. Patent No. 9,934,389, entitled “Provisioning of a shippable storage device and ingesting data from the shippable storage device,” issued April 3, 2018; and U.S. Patent No. 10,482,413, entitled “Data transfer tool for secure client-side data transfer to a shippable storage device,” issued November 19, 2019 — each cite U.S. Patent No. 9,400,979 (Carrott) as prior art on the face of the issued patent, in each case identified as having been cited by the examiner during prosecution. The ’979 Patent was thus repeatedly placed before Amazon and its patent prosecution counsel, in prosecutions directed to secure data-transfer technology, beginning years before the relevant damages period.

41. Amazon’s own payments patents further demonstrate Amazon’s knowledge of the Carrott patent family in the specific technology field of the Accused Instrumentality. At least three patents assigned to Amazon Technologies, Inc., each directed to payment-service and payment-gateway technology, cite U.S. Patent Application Publication No. 2008/0319914 A1 (Carrott), entitled “Transactional Security Over a Network” (the “’914 Publication”), on the face of the issued patent without an examiner-citation designation: U.S. Patent No. 10,528,931, entitled “Hosted payment service system and method,” issued January 7, 2020; U.S. Patent No. 10,755,323, entitled “Widget-based integration of payment gateway functionality into transactional sites,” issued August 25, 2020; and U.S. Patent No. 11,151,622, entitled “Integration

of payment gateway functionality into transactional sites," filed July 15, 2020 and issued October 19, 2021. On information and belief, Amazon itself disclosed the '914 Publication to the USPTO in Information Disclosure Statements during the prosecution of each of these payments patents, demonstrating that the patent counsel responsible for Amazon's own payment-processing patent portfolio specifically identified the Carrott "Transactional Security Over a Network" disclosure as relevant prior art in the field of payment transaction processing — the field of the Accused Instrumentality.

42. The '914 Publication is the pre-issuance publication of U.S. Application No. 12/202,524, which issued on September 4, 2012 as U.S. Patent No. 8,260,723 — a member of the same Carrott patent family as the Patents-in-Suit, bearing the same title, "Transactional Security Over a Network," and naming the same inventor, Richard F. Carrott. Each citation of the '914 Publication on the face of an Amazon-owned patent placed before Amazon a disclosure that had by then issued as the '723 Patent, and the issued members of the Carrott family — including the '979 and '713 Patents — are identified in the USPTO's public continuity records for the '914 Publication and were readily discoverable through an ordinary family-continuity lookup. Amazon's applicant-side citations of the '914 Publication in its payments-patent prosecutions were of record no later than January 7, 2020 and August 25, 2020 — the issue dates of U.S. Patent Nos. 10,528,931 and 10,755,323 — while the '713 Patent remained in force. Amazon's applicant-side citations to the Carrott patent family date back to at least February 20, 2018, when U.S. Patent No. 9,898,357, assigned to Amazon Technologies, Inc., issued citing Carrott family publication U.S. Patent Application Publication No. 2007/0288394 A1, "Transactional Security Over a Network," without an examiner-citation designation.

43. Benedor itself has publicly identified the Patents-in-Suit on its own website. At all times relevant to damages in this action, Benedor's website at benedor.com included a "The Patents" page that expressly lists U.S. Patent Nos. 8,260,723, 8,463,713, and 9,400,979 among the Benedor patent portfolio. Any ordinary prior-art or freedom-to-operate search performed in connection with Amazon's payment, checkout, and authentication systems would have returned benedor.com as a public identification of the Patents-in-Suit. Benedor, The Patents, https://www.benedor.com/the-patents.html.

44. Despite this knowledge, Amazon continued throughout the relevant damages period to operate the Accused Instrumentality without any license from Benedor.

## III. COUNT I: INFRINGEMENT OF THE '979 PATENT

45. Benedor incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

46. Amazon has directly infringed one or more claims of the '979 Patent, literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering to sell the Accused Instrumentality in the United States during the relevant damages period, in violation of 35 U.S.C. § 271(a).

47. For example, during the relevant damages period, the Accused Instrumentality practiced every step of the method of at least Claim 13 of the '979 Patent. When a customer signed in to the Amazon Shopping app and completed a purchase using a stored payment method, the system, as described above and in Amazon's own materials cited herein:

a. received an entered password from the user into a graphic user interface of the user's computerized device — namely, the Amazon Shopping app's sign-in interface, into which the user entered his or her Amazon account

password, with re-authentication required for certain sensitive account and payment actions;

b. determined, by the processor of the user's device operating in conjunction with Amazon's account-authentication services, whether the entered password was valid, and denied access to the customer's account and its stored payment methods if it was not;

c. based on the password being valid, read a device-specific hardware identifier from the hardware of the user's device, which the Accused Instrumentality used to identify the particular device on which the app was running;

d. determined whether the hardware identifier was valid based on whether it matched at least one permitted hardware identifier — that is, whether the device was one registered to and recognized for the customer's Amazon account through Amazon's device-registration and device-management infrastructure, which maintains the set of devices permitted on each account;

e. based on at least one of the password being valid and the hardware identifier being valid, retrieved a user identifier that identified the user — including, on information and belief, a customer-account identifier, account credential, or session identifier associated with the signed-in customer — from the storage media of the user's device;

f. created an encrypted user code by encrypting the user identifier and the hardware identifier — including, on information and belief, an encrypted

authentication and authorization credential derived from customer-identifying and device-identifying information — for transmission with the customer's transaction request;

g. transmitted, by the input and output device of the user's device, the encrypted user code to a provider — Amazon's retail and payment-processing infrastructure — in a transaction request for a transaction authorization decision over a computer network, with the encrypted user code being sent by the provider to a verification entity, including the payment network and the card-issuing financial institution for the customer's stored payment method, for the transaction authorization decision;

h. received, by the input and output device of the user's device, the transaction authorization decision from the provider — for example, the order confirmation displayed in the Amazon Shopping app; and

i. received, by the user, performance of the transaction request from the provider based on the transaction authorization decision approving the transaction — namely, completion of the purchase and fulfillment of the order.

48. During the relevant damages period, the Accused Instrumentality also practiced every step of the method of at least Claim 19 of the '979 Patent. When a signed-in customer completed a purchase in the Amazon Shopping app using a stored payment method, the Accused Instrumentality: read a device-specific hardware identifier from the hardware of the user's computerized device; determined whether that hardware identifier was valid; based on the

hardware identifier being valid, retrieved a user agreement identifier that identifies the user — including, on information and belief, a stored account credential or token identifying the signed-in customer under the customer's Amazon account agreement — from the storage media of the user's device; created an encrypted user code by encrypting the user agreement identifier and the hardware identifier; transmitted, by the input and output device of the user's device, the encrypted user code to a provider — Amazon's retail and payment-processing infrastructure — in a transaction request for a transaction authorization decision over a computer network; received, by the input and output device, the transaction authorization decision from the provider; and the user received performance of the transaction request from the provider based on the transaction authorization decision approving the transaction request.

49. Amazon itself performed or controlled the performance of every step of the claimed methods. The device-side steps were performed by the Amazon Shopping app — software that Amazon authored, distributed, updated, and controlled — executing on the customer's device in the manner Amazon designed, and the provider-side steps were performed by Amazon's own account-authentication, device-recognition, and retail and payment-processing systems. On information and belief, Amazon also directly performed the complete claimed methods through its own personnel's design, development, testing, and quality-assurance use of the Amazon Shopping app and its checkout flows in the United States during the damages period.

50. To the extent any step or steps of the patented methods are performed by a user of the Accused Instrumentality, Amazon is liable as a vicarious direct infringer because Amazon conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance. Specifically, Amazon conditions the benefit of purchasing goods through the Amazon Shopping app with stored

payment credentials on the user performing certain essential steps of the patented method, including signing in with a valid password on a recognized device, and Amazon establishes the manner and timing of those steps through its design of the Amazon Shopping app and its account-authentication, device-recognition, and checkout infrastructure: the app will not release access to the customer's account and stored payment methods absent the Amazon-specified sign-in, and the checkout cannot be completed except in the sequence and manner the app enforces.

51. To the extent any of the foregoing claim elements is not literally present, it is present under the doctrine of equivalents, because the corresponding features of the Accused Instrumentality perform substantially the same function, in substantially the same way, to achieve substantially the same result.

52. Amazon has also indirectly infringed the '979 Patent by inducing infringement under 35 U.S.C. § 271(b). Amazon actively and knowingly encouraged and instructed its customers to use the Accused Instrumentality in a manner that directly infringes the '979 Patent, including through the customer-facing instructions and help documentation cited above directing customers to sign in to the app, manage the devices registered to their accounts, store their payment methods, and complete purchases through the app's stored-payment checkout.

53. Amazon has also indirectly infringed the '979 Patent by contributing to infringement under 35 U.S.C. § 271(c). Amazon provided the Amazon Shopping app and its integrated sign-in, device-recognition, and stored-payment checkout components, which are material components of the patented invention, knowing them to be specially made and adapted for use in an infringing manner. As implemented in the Accused Instrumentality, these components are not staple articles of commerce suitable for substantial non-infringing use.

54. Amazon's infringement of the '979 Patent has been willful, wanton, and deliberate, at least because Amazon had knowledge of the '979 Patent and the Carrott patent family as alleged above — including through Amazon's own Information Disclosure Statements citing the Carrott family in the prosecution of Amazon's payments patents issued in 2020 and 2021, and Amazon's own disclosure of the '979 Patent itself to the USPTO no later than May 25, 2021 — during the relevant damages period and while the '979 Patent remained in full force and effect, and continued its infringing conduct notwithstanding that knowledge.

55. As a direct and proximate result of Amazon's infringement, Benedor has been irreparably harmed and has suffered damages.

## IV. COUNT II: INFRINGEMENT OF THE '713 PATENT

56. Benedor incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

57. Amazon has directly infringed one or more claims of the '713 Patent, literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering to sell the Accused Instrumentality in the United States during the period relevant to damages for the '713 Patent, in violation of 35 U.S.C. § 271(a).

58. For example, during the period relevant to damages for the '713 Patent, the Accused Instrumentality practiced every step of the method of at least Claim 13 of the '713 Patent. The Amazon Shopping app and Amazon's supporting account-authentication, device-recognition, and stored-payment checkout systems operated in the manner described above — including as documented in Amazon's own help pages as they existed in the fall of 2020, cited above — and when a customer signed in to the Amazon Shopping app and completed a purchase using a stored payment method, the system:

a. received an entered password from the user into a graphic user interface of the user's computerized device — namely, the Amazon Shopping app's sign-in interface;

b. determined, by a processor, whether the entered password was valid based on whether it matched at least one permitted password — namely, the password established for the customer's Amazon account;

c. based on the password being valid, read a device-specific hardware identifier from the hardware of the user's device, which the Accused Instrumentality used to identify the particular device on which the app was running;

d. determined whether the hardware identifier was valid based on whether it matched at least one permitted hardware identifier — that is, whether the device was one registered to and recognized for the customer's Amazon account through Amazon's device-registration and device-management infrastructure;

e. based on the hardware identifier being valid, retrieved a user agreement identifier from the storage media of the user's device, the user agreement identifier identifying an agreement between the user and a verification entity — including, on information and belief, a stored credential or token associated with the customer's selected stored payment method, identifying the customer's cardholder agreement with the card-issuing financial institution for that payment method;

f. created an encrypted user code by encrypting the user agreement identifier and the hardware identifier, each such encrypted code being valid only for a single request for an authorization decision — including, on information and belief, an encrypted authorization credential derived from customer-identifying and device-identifying information and accompanied by a per-request cryptographic signature computed over the particular transaction request, such that the transmitted code was particular to, and usable only for, that single authorization request;

g. transmitted, by the input and output device of the user's device, the encrypted user code to a provider — Amazon's retail and payment-processing infrastructure — in a request for an authorization decision over a computer network, with the encrypted user code being sent by the provider to the verification entity, including the payment network and the card-issuing financial institution for the customer's stored payment method, for the authorization decision; and

h. received, by the input and output device of the user's device, the authorization decision from the provider — for example, the order confirmation displayed in the Amazon Shopping app.

59. Amazon itself performed or controlled the performance of every step of the claimed method, for the reasons alleged above with respect to the '979 Patent: the device-side steps were performed by the Amazon Shopping app — Amazon-authored software executing in the manner Amazon designed — and the provider-side steps were performed by Amazon's own account-authentication, device-recognition, and retail and payment-processing systems. On information

and belief, Amazon's own personnel also performed the complete claimed method through design, development, testing, and quality-assurance use of the Amazon Shopping app and its checkout flows in the United States during the period relevant to damages for the '713 Patent.

60. To the extent any step or steps of the patented method are performed by a user of the Accused Instrumentality, Amazon is liable as a vicarious direct infringer because Amazon conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance, as alleged above with respect to the '979 Patent.

61. To the extent any of the foregoing claim elements is not literally present, it is present under the doctrine of equivalents, because the corresponding features of the Accused Instrumentality perform substantially the same function, in substantially the same way, to achieve substantially the same result.

62. Amazon has also indirectly infringed the '713 Patent by inducing infringement under 35 U.S.C. § 271(b). Amazon actively and knowingly encouraged and instructed its customers to use the Accused Instrumentality in a manner that directly infringes the '713 Patent, including through the customer-facing instructions and help documentation cited above directing customers to sign in to the app, manage the devices registered to their accounts, store their payment methods, and complete purchases through the app's stored-payment checkout.

63. Amazon has also indirectly infringed the '713 Patent by contributing to infringement under 35 U.S.C. § 271(c). Amazon provided the Amazon Shopping app and its integrated sign-in, device-recognition, and stored-payment checkout components, which are material components of the patented invention, knowing them to be specially made and adapted

for use in an infringing manner. As implemented in the Accused Instrumentality, these components are not staple articles of commerce suitable for substantial non-infringing use.

64. On information and belief, Amazon's infringement of the '713 Patent was willful, at least because Amazon's own Information Disclosure Statements citing the Carrott family '914 Publication in the prosecution of Amazon's payments patents were of record no later than January 7, 2020 and August 25, 2020, while the '713 Patent remained in force; the '713 Patent was publicly identified in the USPTO's continuity records for the '914 Publication and on Benedor's website throughout that period; and Amazon nonetheless continued its infringing conduct.

65. As a direct and proximate result of Amazon's infringement, Benedor has been irreparably harmed and has suffered damages.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff BenedorTSE, LLC respectfully requests that this Court enter judgment in its favor and against Defendants Amazon.com Services LLC and Amazon.com, Inc., and grant the following relief:

A. A judgment that Amazon has infringed one or more claims of the '979 Patent and the '713 Patent;

B. A declaratory judgment that the '979 Patent and the '713 Patent were valid and in force throughout the respective damages periods and are enforceable;

C. An award of damages adequate to compensate Benedor for Amazon's infringement, in an amount to be proven at trial, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the Court under 35 U.S.C. § 284;

D. A judgment that Amazon's infringement has been willful, and an order enhancing the damages award up to three times the amount found or assessed, pursuant to 35 U.S.C. § 284;

E. A judgment that this case is exceptional and an award to Benedor of its reasonable attorneys' fees, pursuant to 35 U.S.C. § 285;

F. An award of pre-judgment and post-judgment interest on the damages awarded; and

G. Such other and further relief as the Court may deem just and proper.

## VI. JURY DEMAND

Plaintiff BenedorTSE, LLC hereby demands a trial by jury on all issues so triable.

Dated: September 10, 2026

Respectfully submitted,

/s/ W. David Bridgers

W. David Bridgers (TN BPR #16603)
Chanelle R. Acheson (TN BPR #30008)
Ira C. Waddey (TN BPR #2665)
G. Edward Powell III (TN BPR #43915)
Waddey Acheson LLC
1030 16th Ave South, Suite 300
Nashville, TN 37212
615-839-1100
ed@waddeyacheson.com
*Counsel for Plaintiff BenedorTSE, LLC*